IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 1, 2022

## IN RE KYLIE H. ET AL.

**Appeal from the Juvenile Court for Dyer County**
**No. 7565      Jason L. Hudson, Judge**

_____

**No. W2021-00612-COA-R3-PT**

_____

This is a termination of parental rights case. The Tennessee Department of Children's Services filed a petition to terminate the parental rights of a mother as to two of her minor children on various grounds. The trial court ultimately concluded that grounds existed for termination and that termination was in the best interests of the children. The mother now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Thomas Weakley, Dyersburg, Tennessee, for the appellant, Heather A.

Herbert H. Slatery, III, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

*The Dependency and Neglect Proceedings*

Heather A. ("Mother") and Justin H.[1] ("Father") are the parents[2] of two minor

---

[1] The petition at issue also sought to terminate Father's rights, which were ultimately terminated by the trial court. However, Father did not appeal the termination. Accordingly, we address Father in this appeal only insofar as the pertinent facts of the matter require.

[2] According to the trial court's final order terminating Mother's parental rights, no father was listed on the birth certificate for Kylie, although the record on appeal reflects that Father, in fact, was listed on

children: Kylie H. (born in May 2015) and Kaylee H. (born in September 2016) (collectively "Children"). According to a petition for dependency and neglect filed by the Department of Children's Services ("DCS") on April 3, 2019, DCS received a referral on January 2, 2019 regarding the Children, alleging environmental neglect. At the time of this referral, Mother was incarcerated for violation of her probation as a result of testing positive for methamphetamine. This probation was the result of a previous conviction for aggravated assault. Father was also incarcerated at the time for violation of his probation, a registration violation, unlawful drug paraphernalia, possession of schedule II drugs, unlawful possession of a firearm, evading arrest, and theft of property. Through its investigation, DCS learned that the Children were residing with Lee H. ("Grandfather") and his girlfriend, Shauna H. According to DCS, the home did not have utilities and only had "minimal food." Further, on January 2, 2019, Grandfather completed a urine drug screen and tested positive for THC. On January 3, 2019, Shauna H. completed a urine drug screen and tested positive for methamphetamine, amphetamine, and THC. On January 16, 2019, Grandfather and Shauna H. agreed to work with DCS and submit to random drug screens and make sure that the utilities were turned on. On February 14, 2019, Shauna H. completed another drug screen and again tested positive for methamphetamine, amphetamine, and THC, while also testing positive for hydrocodone. According to DCS, it attempted to contact the family via phone on February 27, 2019, but received no response. On March 5, 2019, March 22, 2019, and March 26, 2019, DCS attempted to perform a home visit and spoke with Shauna H. on each occasion, as Grandfather was not at the home. DCS asked Shauna H. to have Grandfather call, but DCS never received a phone call. DCS again attempted to perform a home visit on the first two days of April, but neither Grandfather nor Shauna H. were at the home. In the subsequently-filed dependency and neglect petition, DCS requested that temporary legal custody be transferred to it in light of the foregoing facts.

On April 3, 2019, the same day DCS filed its dependency and neglect petition, the Children were removed from the physical custody of Grandfather via a protective custody order entered in the Juvenile Court of Dyer County. According to a sworn custodian affidavit and a hair follicle drug screen, the Children tested positive for methamphetamine at the time of their removal. Upon their removal, the Children were placed in a foster home where they have remained. In an order entered on October 14, 2019, Mother and Father stipulated that there was "clear and convincing evidence that [the Children] were dependent and neglected at the time of the removal due to the incarceration of both parents and due to the illegal drug use of the custodians the [C]hildren were residing with at that time."

*Mother's Pertinent Criminal History and Drug Issues*

Previously, Mother incurred charges because one of her minor children, not at issue in these proceedings, tested positive for methamphetamine. Although Mother was initially

Kaylee's birth certificate. Mother identified Father as Kylie's father at trial.

charged with aggravated child neglect on a child eight years old or younger, Mother pled to a reduced charge of aggravated assault. Mother admitted that, at the time, she had a drug problem and was using methamphetamine and marijuana. She was placed on probation, but after violating her probation, she was continuously incarcerated from October 20, 2018, prior to the filing of DCS' dependency and neglect petition, until her release on November 3, 2020.

Mother admitted that in 2017 she had completed a drug and alcohol program and was subsequently placed in a halfway house from March 2017 until October 2017. However, according to Mother, despite her completion of the drug and alcohol program, her last use of methamphetamine and marijuana was in August 2018, approximately one year after completing the program.

*The Permanency Plans*

There were two separate permanency plans developed during the dependency and neglect matter. The first permanency plan was created on May 8, 2019. According to the trial court, Mother participated in the permanency plan's development. Pursuant to this first plan, Mother was responsible for completing an alcohol and drug assessment and following all recommendations, completing a mental health intake assessment and following all recommendations, submitting to and passing random drug screens, maintaining regular visitation with the Children, complying with her sentence requirements and not receiving additional charges, demonstrating during visitation appropriate supervision and the ability to parent the Children in an age-appropriate manner, and notifying DCS of any changes in contact information. During the pendency of this first plan, Mother did not complete an alcohol and drug assessment or a mental health assessment or submit to drug screens. However, Mother did maintain regular phone calls with the Children but, due to her incarceration, was unable to have in-person visitation. A second permanency plan was developed on April 28, 2020. Mother again participated in this plan's development. Her responsibilities remained largely the same in this plan except that she was also required to "participate in services or courses offered at her prison facility."

*Termination Proceedings*

On June 15, 2020, DCS filed a petition to terminate Mother's parental rights. In its petition, DCS set forth several grounds for termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g). Among other grounds for termination, DCS alleged that there had been abandonment by an incarcerated parent as well as "substantial noncompliance" with the permanency plans discussed above. DCS further contended that there were grounds for termination as a result of a prior conviction for child abuse as well as a failure to manifest an ability and willingness to care for the Children.

A trial was held on the petition on April 16, 2021. In an amended order dated June 14, 2021, the trial court made numerous findings concerning the grounds alleged by DCS against Mother.[3] As to the ground of abandonment by an incarcerated parent, the trial court found that there was "clear and convincing evidence that Mother abandoned the [C]hildren by being in jail part of all of the four months" prior to the filing of the termination petition and that Mother had "engaged in conduct that exhibits a wanton disregard for the [C]hildren's welfare by abusing drugs and engaging in criminal behavior." As to the ground of substantial noncompliance with the permanency plans, the trial court found that there was clear and convincing evidence that Mother was indeed in substantial noncompliance with the plans. Specifically, the trial court noted in its order Mother's failure to comply with the majority of her responsibilities listed in the plans. As to the ground for a sentence of child abuse, the trial court determined that DCS had failed to establish by clear and convincing evidence that Mother was sentenced to two or more years of imprisonment for actions constituting severe child abuse pursuant to Tennessee Code Annotated section 36-1-113(g)(5).[4] It also found that there was clear and convincing evidence that Mother failed to manifest an ability and willingness to care for the Children and that placing them in her custody "would pose a substantial harm to the [C]hildren." After determining that there existed grounds for termination of Mother's parental rights, the trial court also found that it was in the Children's best interest for Mother's rights to be terminated. Specifically, in conjunction with the factors set forth in Tennessee Code Annotated section 36-1-113(i), the trial court noted that Mother had not made any lasting adjustment of circumstances that would make it safe for the Children to be in her home and that, despite DCS' best efforts, it was apparent that a lasting adjustment would not "reasonably appear possible." Moreover, the trial court acknowledged that Mother was involved in criminal activity concerning drugs, which raised "significant concerns about [her] physical environment," and the court further observed that Mother had, at the time, only recently been released from prison. Finally, the trial court also found that a change in caretakers and physical environment would be detrimental to the Children's emotional and psychological condition, as they had been residing in the same foster home for over two years and had bonded with the foster family and had a "questionable" relationship with Mother. This appeal followed.

## ISSUES PRESENTED

Mother raises two issues on appeal for our review, restated as follows:

---

[3] The original order was entered on May 13, 2021. However, due to a "clerical mistake," there was a paragraph containing the names of parties who were not part of the proceedings. Accordingly, an amended order was entered to rectify that mistake.

[4] In their brief on appeal, DCS raises an issue that the trial court erred when it declined to terminate Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(5). However, in light of the manner of our disposition contained herein, we pretermit this issue.

- 4 -

1. Whether there exists clear and convincing evidence that there are grounds for termination of Mother's parental rights; and
2. Whether there exists clear and convincing evidence that termination of Mother's parental rights is in the Children's best interests.

## STANDARD OF REVIEW

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)). Although this right is considered to be both fundamental and constitutionally protected, it is not absolute. *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). This right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). "[T]he state as *parens patriae* has a special duty to protect minors," *Hawk v. Hawk*, 855 S.W.2d 573, 580 (Tenn. 1993) (quoting *Matter of Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)), and "Tennessee law . . . thus . . . upholds the state's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Id.*

Under Tennessee law there exist "[w]ell-defined circumstances . . . under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). These circumstances are statutorily defined. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005)). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007).

Due to this heightened burden of proof, we must adapt our customary standard of review:

First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to

- 5 -

terminate a biological parent's parental rights.

*In re Audrey S.*, 182 S.W.3d at 861.

## DISCUSSION

*Abandonment By an Incarcerated Parent*

Mother's first issue on appeal is whether the trial court erred in finding by clear and convincing evidence that she had committed abandonment by an incarcerated parent. Abandonment by an incarcerated parent is expressly defined by Tennessee Code Annotated section 36-1-102(1)(A)(iv) and is established when:

> A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
> (a) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;
> (b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or
> **(c) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]**

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added).[5]

As this Court has previously noted, this ground for termination is not applicable *solely* on the basis that a parent is incarcerated. *In re Audrey S.*, 182 S.W.3d at 866. Rather, "[a]n incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Indeed, incarceration "serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in

---

[5] Based on our review of the trial court's order, it found Mother had committed abandonment via incarceration and engaged in conduct prior to incarceration that exhibited a wanton disregard for the Children. Accordingly, our analysis of the trial court's findings is limited to the portions of section 36-1-102(1)(A)(iv)(c) concerning wanton disregard.

incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* This Court has held in prior cases that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." *Id.* at 867-68. In determining whether certain conduct rises to the level of wanton disregard, we have previously explained that "'a parent's criminal behavior does not automatically constitute wanton disregard for the welfare of a child,' but such behavior may 'constitute such a wanton disregard under the appropriate circumstances.'" *In re Jonathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014)). "When considering whether a parent's criminal conduct constitutes wanton disregard, we consider 'the severity and frequency of the criminal acts.'" *Id.* (quoting *In re Kierra B.*, 2014 WL 118504, at *8).

Turning to the present matter, in its order terminating Mother's parental rights, the trial court determined as follows:

> There is clear and convincing evidence that Mother abandoned the [C]hildren by being in jail part of all of the four months just before the Petition to Terminate Parental Rights was filed and that she has engaged in conduct that exhibits a wanton disregard for the [C]hildren's welfare by abusing drugs and engaging in criminal behavior.

In her brief, Mother maintains "that the record does not reflect that there was evidence of abandonment regarding those four months before she went into custody of October of 2018" and that "[t]here is no evidence that during the four months preceding when [Mother] began that incarceration . . . [she] engaged in conduct that exhibit[ed] a wanton disregard for the welfare of the [C]hildren." Respectfully, we find this argument to misinterpret the requirements under the statute. Despite Mother's insistence that there was no evidence presented as to wanton disregard in the four months preceding her incarceration, this Court has previously held that "parental conduct exhibiting wanton disregard for a child's welfare may occur *at any time* prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) (emphasis added) (citing *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, *8 (Tenn. Ct. App. Apr. 30, 2009)).

Based upon our review of the record and the trial court's order, we find that there was indeed clear and convincing evidence to support a finding of wanton disregard in connection with the ground of abandonment by an incarcerated parent. In support of this, we first note that Mother was continuously incarcerated when the petition to terminate her rights was filed and during the preceding four-month period. Moreover, as the trial court

noted, Mother has an extensive history of drug use that ultimately led to her being incarcerated at the time of the filing of the petition. As we have previously noted, this incarceration was the result of a probation violation after Mother tested positive for methamphetamine. In fact, it was this incarceration that ultimately led to the Children being placed with Grandfather and further exposed to drug abuse and unsafe living conditions. Of particular concern is the fact that Mother unilaterally chose to partake in drug use, knowing that such action would be a violation of her probation and would result in the Children being removed from her custody and thereby potentially risk their physical and psychological wellbeing. As we noted previously, this Court has repeatedly held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. Here, Mother's conduct clearly exhibited a wanton disregard for the Children's welfare. She chose to partake in illegal substance abuse, violating her probation, which ultimately led to the Children being placed into another harmful and dangerous environment. In light of the foregoing, we conclude that there is indeed clear and convincing evidence to support a finding of wanton disregard. Accordingly, we affirm the trial court's finding of abandonment by incarceration in this regard.

### *Substantial Noncompliance with the Permanency Plan*

Mother also maintains that the trial court's finding of her being in substantial noncompliance with the permanency plan was in error. Tennessee Code Annotated section 36-1-113(g)(2) provides that termination of a party's parental rights may be predicated upon a "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). The mere "fact that a parent is noncompliant with a permanency plan is not sufficient to terminate parental rights." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *6 (Tenn. Ct. App. June 21, 2017) (citing *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002)). Rather, there must be a finding that a parent's noncompliance with a permanency plan is substantial. *Id.* (citing *In re Valentine*, 79 S.W.3d at 548). Whether there has been substantial noncompliance with a permanency plan is a question of law which we review de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548. Although substantial noncompliance is not statutorily defined, our Supreme Court has previously stated that "[i]n the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement [and] [t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* Accordingly, "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548; *Dep't of Children's Servs. v. C.L.*, No. M2001-0279-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003)).

Here, we agree with the trial court that there existed clear and convincing evidence to support this ground for termination. The first permanency plan was dated May 8, 2019 and required the following of Mother:

1. Complete a mental health intake and follow all recommendations;
2. Sign releases of information such that DCS can "monitor, track, and adjust" all services provided to Mother;
3. Submit to random drug screens and test negative;
4. Submit to an alcohol and drug assessment and follow all recommendations;
5. Inform DCS if her contact or address changes within 24 hours of the changes occurring;
6. Comply with her sentence requirements and not accrue additional charges; and
7. Have "quality supervised visitation for at least 2 visits per month lasting at least 2 hours each."

According to the trial court's order terminating Mother's parental rights, "[w]ith the exception of Mother participating in telephone calls with the [C]hildren and complying with the sentence requirements, Mother . . . completed none of the tasks during the time this plan was in effect."[6] Specifically, the trial court noted that Mother did not complete an alcohol and drug assessment or a mental health assessment. The second permanency plan was dated April 28, 2020. Mother's responsibilities under this second plan remained largely the same as the first, with the addition of requiring Mother to "participate in services/courses that are offered at the prison" and to maintain contact with DCS in order to facilitate "completion of action steps" in the permanency plan. As to this plan, the trial court again determined that Mother was in substantial noncompliance. Of note, a DCS case manager testified that, as to Mother's requirements under this permanency plan, "[s]he was complying with sentencing at that time and random drug screens at the correctional facility." Otherwise, according to the case manager, she was not in compliance.[7]

In reviewing both of the permanency plans in effect in this case, we can ascertain

---

[6] It appears that this particular permanency plan was in place until the subsequent permanency plan developed on April 28, 2020 went into effect.

[7] This same DCS case manager testified, and the trial court noted in its order, that, in response to a question as to whether Mother had completed a mental health intake, Mother had "been at Mending Hearts Halfway House completing their program," and the case manager had received a certificate of completion for that program the day prior to the trial. However, in its order, the trial court noted that, although Mother's incarceration may have arguably contributed to her lack of compliance, "incarceration alone is not a complete barrier to Mother for completing her responsibilities," as the DCS case manager had testified that there were courses offered through Mother's facility that she could have utilized to comply with the plan, but that she chose not to do so for over a year.

- 9 -

from Mother's responsibilities that both plans were designed to focus on Mother's drug abuse and mental health issues, as well as issues she had with her then-present incarceration. In separate orders ratifying each permanency plan, the trial court determined that the plans were reasonable with appropriate responsibilities assigned to Mother that were reasonably related to the goal of reunification. We agree with the trial court. Based on the history of this case, it is apparent that Mother's extensive long-term drug abuse, ultimately resulting in incarceration, was largely what led to the dependency and neglect petition and then later the termination proceeding against her. Based on the record, Mother failed to complete a drug and alcohol assessment and follow the recommendations. Moreover, according to trial testimony, Mother's submission of a completed mental health intake was not received until trial, long after the permanency plans were put into place.

Although we would be remiss not to acknowledge that Mother did in fact comply with portions of the permanency plans, we find her failure to complete the alcohol and drug assessment to be highly significant considering her extensive history of drug abuse. The record on appeal makes it clear that Mother's history of drug abuse is largely the main contributing factor that ultimately led to her incarceration prior to the termination proceedings. Indeed, Mother's incarceration at the time the petition for termination was filed was also the result of her methamphetamine use due to a positive drug screen while on probation.[8]

In light of the foregoing, we conclude that there is clear and convincing evidence to support a finding of Mother's substantial noncompliance with the permanency plan, and we affirm the trial court in this regard.

*Failure to Manifest an Ability and Willingness*

Mother also contends that the trial court erred in finding that she had failed to manifest an ability and willingness to care for the Children. Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

In order for Mother's parental rights to be terminated pursuant to this ground, DCS must show, by clear and convincing evidence, that Mother has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of

---

[8] As we noted previously, Mother was on probation as a result of a prior conviction for aggravated assault.

the Children. *Id.* DCS must then prove that placing the Children in Mother's custody poses "a risk of substantial harm to the physical or psychological welfare of" the Children. *Id.* Section 36-1-113(g)(14) requires a parent to "manifest *both* an ability and willingness to personally assume legal and physical custody or financial responsibility." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis added). Accordingly, if a party seeking the termination of parental rights establishes that a parent has "failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)).

In its order, the trial court found that this ground was supported by clear and convincing evidence. Specifically, it noted Mother's residency at a halfway house which "would not be an appropriate home" for the Children. Despite the fact that Mother was apparently looking for another home, she had not taken sufficient action prior to trial, with the court noting that "[t]here simply has not been enough progress shown" by Mother. Moreover, the trial court noted its concerns regarding Mother's stability, stating that "[M]other is still within a structured environment and has not shown that she will not resume previous habits and behaviors." Aptly noted by the trial court, "[m]ere words are not enough to establish the ability and willingness of a parent to assume legal custody and financial responsibility for their children, and there is not enough progress and stability to show that Mother could do this at this time." The trial court also found that Mother had not demonstrated that she was willing to assume a parental relationship with the Children as she had "failed to participate in any services over the entirety of the case until approximately the last 4 months" in addition to not having "established a safe and stable permanent home." Accordingly, the court determined that Mother had failed to manifest an ability and willingness to assume physical and legal custody, as well as financial responsibility, of the Children. We take no issue with the trial court's findings in this regard. Not only did Mother not have a suitable home in which the Children could reside with her, she had not yet demonstrated her ability to remain stable once outside of a controlled environment. Due to her extensive drug use history and previous violation of her probation, we find the trial court's concern warranted. Although we acknowledge the strides Mother has made in obtaining employment and working to improve her situation, we cannot say that this is sufficient to render a showing that she has the ability and willingness to assume physical and legal custody, and financial responsibility, of the Children, as there was no indication of any concrete plans Mother had to care for the Children, who had been out of her custody for more than two years. Accordingly, we conclude that there was clear and convincing evidence to show that Mother had failed to manifest an ability and willingness to assume legal and physical custody, and financial responsibility, of the Children.

As to the second prong, the trial court also found that placing the Children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. Specifically, it noted that "[t]he only parent the [C]hildren have

known for the last 2 years is their foster parent [and] [t]hey have bonded with their foster family." Furthermore, the Children's bond to Mother as a parent was also in question in the trial court below, with proffered testimony by the DCS case manager indicating fear in the Children when partaking in video chats with Mother. Ultimately, the case manager testified that she believed that there was no bond between the Children and Mother. In light of this, taken in conjunction with Mother's previous actions that ultimately resulted in the Children being placed in the custody of relatives who were abusing methamphetamine, we conclude that placing the Children in Mother's custody would pose a risk of substantial harm to the Children's physical and psychological welfare and that, as found by the trial court, "[r]emoving the [C]hildren from a stable, drug free home to a near stranger poses a risk of substantial harm to the [C]hildren."

Accordingly, as the trial court's determination concerning section 36-1-113(g)(14) has been satisfied by clear and convincing evidence, we affirm the trial court's termination of Mother's parental rights on this ground.

*Best Interests of the Children*

Once it is determined that a ground exists for terminating a party's parental rights, the focus then shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated section 36-1-113(i) provides a non-exhaustive list of factors for the courts to consider whether termination is in the child's best interest, as follows:[9]

(1) Whether the parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

---

[9]Although not relevant to the issues posed by this particular appeal, we observe that Tennessee Code Annotated section 36-1-113(i) was recently amended by the General Assembly to incorporate additional factors to be considered as part of the best interest analysis under the statute. *See* 2021 Tenn. Pub. Acts, c. 190, §1. This amended version went into effect on April 22, 2021, well after the filing of the petition in this matter, which occurred on June 15, 2020. As such, we analyze the best interest factors as they existed at the time of the filing in this matter. *See In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004) ("[S]tatutes are presumed to operate prospectively unless the legislature clearly indicates otherwise.").

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Supreme Court has previously elucidated:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."

When conducting the best interests analysis, courts must consider . . . [the] statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceedings is free to offer proof of any other factor relevant to the best interests analysis. Facts considered in the best interests analysis must be proved by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's rather than the parent's perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child."

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (internal citations omitted). Making a determination as to a child's best interest "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s . . . factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

Here, after analyzing the above enumerated best interests factors, the trial court determined that it was in the Children's best interests to terminate Mother's parental rights. On appeal, it appears that Mother's primary argument against the trial court's best interests finding is that she maintained regular phone calls with the Children.[10] As will be discussed in more detail below, however, we affirm the trial court's determination as to the Children's best interests.

Mother's argument concerning her phone calls with the Children fails to take into consideration the trial court's findings regarding the other factors concerning best interests. Moreover, her argument fails to even take into proper account what the evidence demonstrated regarding the quality of Mother's calls with the Children. Of particular importance to this latter point is testimony indicating that, during video calls with Mother, the Children tend to either flee or do not participate and do not appear to have a bond with Mother.

Regarding the other factors and considerations in this case, we find that they also favor terminating Mother's rights. The trial court was correct in that Mother has failed to make an adjustment of circumstances that would make it safe and in the Children's best interests to be in her home. Mother was released from prison shortly before the trial and was living in a halfway house. She had not yet established a "safe and stable permanent home" for herself and the Children, and in light of her prior drug history, there are concerns as to Mother's ability to remain stable once she is no longer in a controlled environment. *See* Tenn. Code Ann. § 36-1-113(i)(1). Moreover, the record shows that Mother has not made a lasting adjustment after reasonable efforts by social services agencies for such a duration of time that a lasting adjustment appears possible. Specifically, Mother only recently began working with services identified in the permanency plan, despite the fact that DCS made efforts to ensure that she could take classes while incarcerated. It appears that Mother only recently began to make any progress, despite services being offered for

---

[10] Mother also maintains that this case would be an appropriate application for the missing witness rule, which provides that "the failure of a party to call a witness gives rise to a permissible inference that the missing witness' testimony would have been unfavorable to the party who failed to call the witness." *In re Estate of Price*, 272 S.W.3d 113, 140 (Tenn. Ct. App. 2008) (quoting *Gentry v. Gentry*, No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *4 (Tenn. Ct. App. July 25, 2001)). However, Mother fails to indicate in the record wherein she requested such an inference to be drawn in the trial court. Accordingly, we decline to address this assertion on appeal.

two years. In light of the length of time in which services have been offered, we do not find a recent effort to be sufficient in evincing a lasting adjustment. *See* Tenn. Code Ann. § 36-1-113(i)(2). The record also supports a finding of neglect on the part of Mother towards the Children. Specifically, Mother has admitted that she has a drug history which ultimately resulted in her incarceration and the placement of the Children in Grandfather's custody where they later tested positive for methamphetamine. Furthermore, Mother's previous criminal activity concerning drugs raises significant concerns about any potential physical environment the Children may be in while in her custody. Again, as we noted earlier, Mother failed to complete the alcohol and drug assessment required of her in the permanency plans. In light of this, there are valid concerns that circumstances exist which render Mother unable to properly care for the Children. *See* Tenn. Code Ann. § 36-1-113(i)(7). Finally, we also find that the record supports the finding that a change in the caretakers and physical environment of the Children would be detrimental to their emotional and physical condition. *See* Tenn. Code Ann. § 36-1-113(i)(8). The Children have been in the same foster home since April 3, 2019. The foster family wishes to adopt the Children, and the record provides clear and convincing evidence that changing caretakers at this point would be detrimental to the Children due to their bond with the foster family. As such, we conclude that this factor weighs in support of terminating Mother's parental rights.

We, therefore, conclude that the facts here are clear and convincing such that termination is in the Children's best interests and favor termination of Mother's parental rights. Although we acknowledge Mother's contention that she maintained regular visitation with the Children via telephone calls and video chats, we find no indication that the Children have a meaningful relationship with her. Moreover, the record clearly supports that the Children are in a safe and stable pre-adoptive home and have a bond with their foster family, and when considering this and all of the facts of this case, we therefore agree with the trial court's finding that the termination of Mother's parental rights is in the best interests of the Children.

## CONCLUSION

Based on the foregoing, we affirm the trial court's order terminating Mother's parental rights.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE
